UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| KYLIE A. P.[1], | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:21-cv-046 |
| | ) |
| KILOLO KIJAKAZI [2], | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

This matter is before the court on petition for judicial review of the decision of the Commissioner filed by the plaintiff, Kylie P., on February 2, 2021. For the following reasons, the decision of the Commissioner is **REMANDED.**

*Background*

The plaintiff, Kylie P., filed an application for Supplemental Security Income, alleging a disability onset date of October 9, 2014. (Tr. 38). The Disability Determination Bureau denied Kylie P.'s applications initially on April 9, 2018, and again upon reconsideration on August 24, 2018. (Tr. 38). Kylie P. subsequently filed a timely request for a hearing on September 20, 2018. (Tr. 38). A hearing was held on March 5, 2020, before Administrative Law Judge (ALJ) Stephanie Katich. (Tr. 38). A supplemental hearing was held on July 14, 2020, for additional medical expert testimony. (Tr. 38). Vocational Expert (VE) Amy Kutschbach and Medical Expert (ME) Jeffrey Andert, M.D., appeared at the supplemental hearing. (Tr. 38). The ALJ

---

[1] To protect privacy, the plaintiff's full name will not be used in this Order.
[2] Andrew M. Saul was the original Defendant in this case. He was sued in his capacity as a public officer. On July 9, 2021, Kilolo Kijakazi became the acting Commissioner of Social Security. Pursuant to **Federal Rule of Civil Procedure 25(d)**, Kilolo Kijakazi has been automatically substituted as a party.

issued an unfavorable decision on July 28, 2020.  (Tr. 35-50).  The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6).

At step one of the five-step sequential analysis for determining whether an individual is disabled, the ALJ found that Kylie P. had not engaged in substantial gainful activity since October 27, 2017, the application date.  (Tr. 40).

At step two, the ALJ determined that Kylie P. had the following severe impairments: unspecified convulsions/seizure disorder, obesity, major depressive disorder, posttraumatic stress disorder, nightmare disorder, bipolar disorder, unspecified anxiety disorder/generalized anxiety disorder, cannabis use disorder, dissociative identity disorder, and borderline personality disorder.  (Tr. 40).  The ALJ found that the above medically determinable impairments significantly limited Kylie P.'s ability to perform basic work activities.  (Tr. 40).  Kylie P. also alleged disability due to anemia, varicose veins of bilateral lower extremities, bilateral knee disorder, a left hip disorder, hypertension, and headaches.  (Tr. 40).  However, the ALJ indicated that those impairments caused no more than a minimal limitation on her ability to engage in basic work activities, and therefore they were considered non-severe impairments.  (Tr. 41).

At step three, the ALJ concluded that Kylie P. did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (Tr. 41).  The ALJ found that no medical evidence indicated diagnostic findings that satisfied any listed impairment.  (Tr. 41-42).

After consideration of the entire record, the ALJ then assessed Kylie P.'s residual functional capacity (RFC) as follows:

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can never climb ladders, ropes, or scaffolds, she can occasionally climb stairs and ramps,

> balance, stoop, kneel, crouch, and crawl, she should avoid all exposure to unprotected heights, she can tolerate frequent exposure to moving mechanical parts and operation of a motor vehicle, she can tolerate occasional exposure to extreme cold, extreme heat and vibration, and she can tolerate exposure to very loud noise. In addition, the claimant can understand, remember and carry out simple instructions and 1-3 step tasks, she can make judgments on simple work-related decisions, she is not able to process written instructions or a written work product involving complex or detailed reading comprehension, she can respond appropriately to occasional interactions with coworkers and supervisors limited to a small group of individuals with whom routine interaction is necessary (e.g. 12 or less), she can tolerate occasional contact with the general public, she can respond appropriately to usual work situations, and she can deal with routine changes in a routine work setting free from fast paced production requirements, such as assembly line work activity, and she is able to work toward a daily quota of productivity.

(Tr. 43). The ALJ explained that in considering Kylie P.'s symptoms, she followed a two-step process. (Tr. 43). First, she determined whether there was an underlying physical or mental impairment that was shown by a medically acceptable clinical or laboratory diagnostic technique that reasonably could be expected to produce Kylie P.'s pain or other symptoms. (Tr. 44). Then she evaluated the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limited Kylie P.'s functioning. (Tr. 44).

After considering the evidence, the ALJ found that Kylie P.'s medically determinable impairments reasonably could have caused some symptomology. (Tr. 44). However, the ALJ found that her statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 44). The ALJ found the opinion and testimony of Dr. Andert, the medical expert who testified at the supplement hearing, to be persuasive. (Tr. 47).

At step four, the ALJ found that Kylie P. was unable to perform her past relevant work as a cashier/checker. (Tr. 49). However, the ALJ found jobs that existed in significant numbers in

the national economy that Kylie P. could perform. (Tr. 49-50). Therefore, the ALJ found that Kylie P. had not been under a disability, as defined in the Social Security Act, since October 27, 2017, the date the application was filed. (Tr. 50).

*Discussion*

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); ***Moore v. Colvin***, 743 F.3d 1118, 1120–21 (7th Cir. 2014); ***Bates v. Colvin***, 736 F.3d 1093, 1097 (7th Cir. 2013) ("We will uphold the Commissioner's final decision if the ALJ applied the correct legal standards and supported her decision with substantial evidence."). Courts have defined substantial evidence as "such relevant evidence as a reasonable mind might accept to support such a conclusion." ***Richardson v. Perales***, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 852 (1972) (quoting ***Consol. Edison Co. v. NLRB***, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 2d 140 (1938)); *see* ***Bates***, 736 F.3d at 1098. A court must affirm an ALJ's decision if the ALJ supported her findings with substantial evidence and if there have been no errors of law. ***Roddy v. Astrue***, 705 F.3d 631, 636 (7th Cir. 2013) (citations omitted). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." ***Lopez ex rel Lopez v. Barnhart***, 336 F.3d 535, 539 (7th Cir. 2003).

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. § 423(d)(1)(A)**. The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. **20 C.F.R. § 416.920**. The ALJ first considers whether the claimant is presently employed and "doing . . . substantial gainful activity." **20 C.F.R. § 416.920(b)**. If she is, the claimant is not disabled, and the evaluation process is over. If she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities." **20 C.F.R. § 416.920(c)**; *see Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (discussing that the ALJ must consider the combined effects of the claimant's impairments). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. **20 C.F.R. § 401, pt. 404, subpt. P, app. 1**. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of her past work. If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled. **20 C.F.R. § 416.920(e)**. However, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience, and functional capacity to work, is capable of performing other work and that such work exists in the national economy. **42 U.S.C. § 423(d)(2); 20 C.F.R. § 416.920(f);** *see Biestek v. Berryhill,* 139 S. Ct. 1148 (2019) (upon the disability benefits applicant's request, vocational expert's refusal to provide the private market-survey data

underlying her opinion regarding job availability does not categorically preclude the expert's testimony from counting as "substantial evidence" but, instead, the inquiry is case-by-case).

Kylie P. has requested that the court remand this matter for additional proceedings. In her appeal, Kylie P. has argued that the ALJ's RFC was not based upon substantial evidence. Kylie P. specifically alleges that the ALJ erred in evaluating the medical opinions and the third-party testimony of Rebecca Browning. Additionally, she claims that the ALJ erred in the Listings analysis at Step 3, including erring in analyzing the paragraph B criteria in evaluating her subjective symptoms as required by SSR 16-3p.

Of the four arguments, the court finds it necessary only to address portions of the first, second, and third argument, as the ALJ repeatedly mischaracterized evidence and ignored relevant evidence in the record. Kylie P. argues that the ALJ failed to properly consider the testimony of Rebecca Browning, the supervising case manager at Cedars Hope, the assisted living facility where Kylie P. currently resides. Ms. Browning was not a medical source as defined in **20 C.F.R. § 416.902**, and therefore the ALJ was not obligated to consider Ms. Browning's testimony in the same way that she would medical opinion evidence. **20 C.F.R. § 416.913(a)(4).** However, the ALJ must still consider Ms. Browning's testimony, as the RFC must be based on "all relevant evidence" in the case record. **20 C.F.R. § 416.945**.

Ms. Browning testified that in order to reside at Cedars Hope, a person's mental impairment must be so limiting that she cannot perform "day to day function[s]" without assistance. (Tr. 68). She specifically stated that the mental impairments "ha[d] to be disabling," but clarified that the impairment must just interfere with day to day functioning to such an extent that a person requires assistance. (Tr. 68). She testified that Kylie P. required reminders for appointments, to take medications, to do chores, and even to get out of bed on some days. (Tr

6

68-69). Ms. Browning stated that without reminders, Kylie P. likely would have stayed in bed the majority of the time. (Tr. 69). She testified that when Kylie P. got anxious, she would get overwhelmed to the point of "almost parlay[sis]," which prevented her from getting out of bed. (Tr. 69). Ms. Browning further testified that Kylie P. got along well with certain personality types, but with others she would get "very defensive very quickly. She g[o]t very angry. She [would] take[] things very personal that most wouldn't take personal and then she internalize[d] it, which cause[d] anxiety." (Tr. 69-70). Ms. Browning stated that Kylie P. coped with her anxiety in one of two ways: either she internalize[d] it and "shut[] down," or she "yell[ed] … almost like an explosion." (Tr. 70). Ms. Browning stated that when Kylie P. "shut[] down," she did not speak, would retreat to her room, refused to answer the door or talk to anyone, and refused to work out the situation or see any point of view other than her own current feelings. (Tr. 70). Ms. Browning testified that those behaviors (either shutting down or yelling) occured at least three times a week. (Tr. 70).

  Ms. Browning also stated that Kylie P. struggled with change, causing her anxiety to rise, which often led to her locking herself in her room and refusing to get out of bed. (Tr. 72). Ms. Browning further noted that Kylie P. did well with redirection from her, specifically, but that Kylie P. struggled with redirection from other staff. (Tr. 72-73). When redirected by others, she either would stay in her room or had arguments with the staff and other housemates. (Tr. 73).

  The ALJ did not discuss Ms. Browning's testimony except to say that Cedars Hope's definition of disability was not dispositive and that the ALJ was required to determine disability according to the Social Security regulations. (Tr. 48). While the ALJ was not required to analyze Ms. Browning's testimony in the same way she analyzed medical opinion evidence, Ms. Browning's testimony provided insight into Kylie P.'s impairments and explained some of the

7

discrepancies in the evidence.  The ALJ did not discuss how Ms. Browning's testimony supported the medical evidence and provided explanations for Kylie P.'s limitations.  This becomes relevant when looking at the paragraph B criteria and other medical opinion evidence.

Kylie P. argues that the ALJ mischaracterized evidence regarding her mental impairments in evaluating the paragraph B criteria at step three.  Each of the CFR's Listings for mental disorders consists of paragraph A criteria (a set of medical findings), paragraph B criteria (a set of impairment-related functional limitations), and paragraph C criteria (additional functional criteria).  **20 C.F.R. § Pt. 404, Subpt. P, App.1.**  To satisfy a mental disorder Listing, a claimant must show that her impairment satisfies "the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment."  **20 C.F.R. § 404, Subpt. P, App. 1.**

Paragraph B sets forth the impairment-related functional limitations that are incompatible with the ability to do any gainful activity.  The claimant's functional limitations are assessed by using the four criteria set forth in paragraph B of the listings.  These criteria are: the ability to understand, remember, or apply information; the ability to interact with others; the ability to concentrate, persist, or maintain pace; and the ability to adapt or manage oneself.  **20 C.F.R. § 416.920a**.  These criteria are rated using a five-point scale: none, mild, moderate, marked, or extreme.  **20 C.F.R. § 416.920a.**  Each functional limitation must be evaluated to determine the severity, taking into consideration "all relevant and available clinical signs and laboratory findings, the effects of the symptoms, and how [the claimant's] functioning may be affected by factors including, but no limited to, chronic mental disorder, structured settings, medication, and other treatment."  **20 C.F.R. § 416.920a(c).**  To satisfy the paragraph B criteria, the claimant must establish "marked" limitations in one of these areas in addition to "repeated" episodes of

decompensation of extended duration. **20 C.F.R. § Pt. 404, Subpt. P, App. 1.**

The ALJ found that Kylie P. had a moderate limitation in understanding, remembering, or applying information. (Tr. 41). The ALJ relied on evidence showing that her memory was observed to be intact and that she had not undergone formal memory care or treatment for a memory impairment. (Tr. 41). The ALJ then found that Kylie P. had a moderate limitation in interacting with others. (Tr. 42). The ALJ noted that despite alleging significant difficulty in social functioning, Kylie P. "confirmed that she [wa]s able to take the bus." (Tr. 42). The ALJ relied on evidence showing that she was capable of interacting well with treating and examining sources, she frequently was noted to be "cooperative," and she showed some improvement in symptoms with medication compliance. (Tr. 42). Additionally, the ALJ relied on a lack of evidence that Kylie P. was unable to respond to social cues and that her mood and affect were described as normal within the record. (Tr. 42).

Next, the ALJ found that Kylie P. had a moderate limitation in concentrating, persisting, and maintaining pace. (Tr. 42). The ALJ found that there was no objective evidence in the record that Kylie P. had an inability to ignore distractions or that she was unable to arrive at treatment timely. (Tr. 42). Lastly, the ALJ found that Kylie P. had a marked limitation in her ability to adapt or manage herself which was consistent with the opinion of the ME who testified at her supplemental hearing. (Tr. 42). However, the ALJ also noted that Kylie P. was unable to pay her bills, manage her medications, and regularly missed appointments. (Tr. 42).

Kylie P. argues that the ALJ mischaracterized or otherwise ignored evidence in analyzing the Paragraph B criteria. The court will consider the ALJ's analysis of each paragraph B criteria that Kylie P. takes issue. Starting with Kylie P.'s ability to interact with others, the ALJ found that despite Kylie P.'s allegations of significant difficulty in social functioning, "she confirmed

that she [wa]s able to take the bus." (Tr 42). This is a mischaracterization of Kylie P.'s testimony. At the hearing, she was asked how she would get to work if she had a job. (Tr. 137). Kylie P. answered that she would have to take the bus, "and that's really hard for [her] to do." (Tr. 137). She testified that it would be difficult because she struggled being around people, she was not good with authority or being told what to do, and she would get angry. (Tr. 137-38). Therefore, the ALJ's finding that Kylie P. confirmed that she could take the bus is a mischaracterization of her testimony.

The ALJ found that clinicians "failed to note [that Kylie P.] was unable to respond to social cues" or showed excess irritability constantly. (Tr. 42). However, the ALJ did not discuss or acknowledge Ms. Browning's testimony regarding Kylie P.'s struggles with social interaction. Ms. Browning testified that when Kylie P. got anxious, she became overwhelmed and either shut down or yelled in such a way that it was "almost like an explosion." (Tr. 70). She further testified that those behaviors occurred three times per week. (Tr. 70).

The ALJ also relied on evidence of normal mood and affect to contradict Kylie P.'s allegations of more than moderate limitations in interacting with others. (Tr. 42). This is also a mischaracterization of the evidence in the record. The ALJ cited to five pages of the medical record to support her conclusion that Kylie P. regularly presented with normal mood and affect. (Tr. 42). As an initial matter, only two of those pages came from mental health providers. (Tr. 574, 754). The other three pages were records of physical examinations. (Tr. 665, 822, 839). Considering Kylie P. was receiving regular treatment from mental health providers throughout the medical record, the ALJ's reliance on physical examinations to support mental health symptoms and findings was in error. *See* **Wilder v. Chater**, 64 F.3d 335, 337 (7th Cir. 1995) (finding that medical records for physical examinations may not accurately track symptoms of

10

depression, as "there is no reason to expect a doctor asked about an eye problem, or back pain, or an infection of the urinary tract to diagnose depression").

Moreover, even the ALJ's reliance on the physical examinations ignored evidence contrary to her conclusion. Two of the treatment notes cited by the ALJ stated normal mood and affect. (Tr. 665, 839). The third physical examination that the ALJ cited to had contradicting information regarding Kylie P.'s affect. It stated both that she exhibited appropriate affect as well as flat affect. (Tr. 822). However, the ALJ solely relied on the finding of appropriate affect without acknowledging the finding of flat affect, therefore also failing to address the discrepancy in the treatment note.

As for the two mental health treatment notes that the ALJ relied on, the ALJ mischaracterized and cherry-picked evidence in the record. The ALJ cited to an initial assessment form Park Center on November 10, 2016. (Tr. 574). While the treatment note indicated normal mood and affect on one page of the report, the next page specifically noted that Kylie P. "ha[d] a significant degree of problems getting along with others," which was an important narrative note in weighing her ability to interact with others. (Tr. 575). More problematic is that the ALJ cited to a mental treatment note that indicated normal mood but failed to acknowledge that the same treatment note also stated that Kylie P.'s mood was euthymic, anxious, and irritable. (Tr. 754). The ALJ clearly engaged in the cherry-picking behavior that the Seventh Circuit so adamantly prohibits.

Similarly, the ALJ ignored the rest of the mental health treatment notes, which often indicated mood and affect that were not normal. On November 17, 2016, a week following the initial assessment cited by the ALJ, Kylie P. exhibited a depressed mood and flat affect. (Tr. 595). On November 8, 2017, she was noted to have a depressed, anxious, and fluctuating mood,

as well as paranoid and depressive thought content, poor judgment, and flat affect. (Tr. 602-03). On November 20, 2017, she again exhibited a depressed and anxious mood, depressive thought content, poor judgment, and blunted affect. (Tr. 607). On April 2, 2018, she exhibited a restricted affect, depressive thought content, and a depressed and anxious mood. (Tr. 688). On April 30, 2018, Kylie P. stated she was doing "much better" and exhibited congruent affect, but she still showed a depressed and anxious mood, as well as depressive thought content. (Tr. 692, 694). Two treatment notes from June 2018 and July 2018 indicated euthymic mood and congruent affect, but they continued to note depressive thought content. (Tr. 700, 729). On January 22, 2019, Kylie P. showed congruent affect, but her mood was noted as euthymic, depressed, anxious, fluctuating, and irritable. (Tr. 735-36). Her thought content was described as depressive, hopeless, helpless, worthless, and guilt, and she was experiencing hallucinations. (Tr. 735-36). In June 2019, she again exhibited congruent affect, but her mood was depressed and anxious. (Tr. 980). She showed poor judgment, as well as depressive, hopeless, helpless, worthless, and guilt thought content. (Tr. 980). In December 2019, she once again showed congruent affect, but she had a depressed and anxious mood. (Tr. 988). She was exhibiting poor judgment, was experiencing hallucinations, and her thought content remained depressive, hopeless, helpless, worthless, and guilt. (Tr. 988). In March 2020, Kylie P. again exhibited congruent affect, yet she showed a depressed mood and depressive thought content. (Tr. 1035). In April 2020, the provider was unable to assess her affect due to the visit being a telehealth audio visit, but her mood was depressed and anxious with depressive thought content. (Tr. 1043-44).

      The ALJ did not acknowledge or discuss any of these treatment notes in finding her affect and mood to be normal throughout the medical record. One treatment note cited by the

ALJ, and only two treatment notes from the summer of 2018 indicated normal mood and affect. (Tr. 574, 700, 729). The rest of the treatment notes indicated that her affect and mood were not regularly normal. Even when her affect was noted to be congruent, her mood remained depressed and anxious. (Tr. 694, 980, 988, 1035). Multiple other treatment notes indicate a depressed and anxious mood along with either blunted, flat, or restricted affect. (Tr. 602-03, 607, 688). An ALJ "cannot simply cherry-pick facts surrounding a finding of non-disability while ignoring evidence that points to a disability finding." ***Reinaas v. Saul***, 953 F.3d 461, 466 (7th Cir. 2020) (finding that the claimant cannot "prevail by arguing that the ALJ improperly weighed the evidence" but can prevail if the "ALJ overlooked entire swaths of it."). The ALJ erred in finding that Kylie P. had normal mood and affect when the vast majority of the mental health treatment notes stated otherwise.

      This error is repeated in the RFC discussion. The ALJ, after noting normal mood and affect in the paragraph B discussion, noted in the RFC analysis that the "facts establish[ed] that the claimant had impaired mood or affect but otherwise had consistently normal functioning in cognition, perception, thought content, thought process, focus, attention, concentration, memory, insight, judgment, appearance, behavior over multiple exams." (Tr. 45). The ALJ specifically stated that "[a]bnormal observations were outliers and not the norm." (Tr. 45). Even without considering the ALJ's inconsistency in her discussion of Kylie P.'s mood and affect between step three and the RFC analysis, the ALJ erred in finding "consistently normal functioning" across all other areas. (Tr. 45). As discussed above, Kylie P. regularly showed abnormal thought content throughout the medical record. She presented with paranoid, depressive, anxious, hopeless, helpless, worthless, and guilt thought content. (Tr. 603, 607, 688, 694, 700, 729, 736, 754, 980, 988, 1035, 1043-44). She also showed poor judgment often enough that it

13

cannot reasonably be considered an outlier as the ALJ found. (Tr. 603, 607, 980, 988). Her perception also was often noted to be abnormal, stating Kylie P. was either suffering from auditory hallucinations or feeling as if her deceased youth group pastor was still with her and helping her. (Tr. 603, 607-08, 736, 980, 988). Multiple treatment notes also reflected abnormal findings with Kylie P.'s recent memory. (Tr. 603, 608, 688, 980, 989). The ALJ incorrectly found that Kylie P. consistently had normal findings with regard to her thought content, judgment, perception, and memory by ignoring multiple treatment notes that showed abnormal findings.

    Kylie P. also asserts that the ALJ erred in analyzing medical opinion evidence. Specifically, Kylie P. alleges that the ALJ erred in considering the medical opinions of her treating psychiatrist, Dr. Mumtaz, and her psychiatric mental health nurse, Teresa Roberts. The Social Security Administration's previous regulations entitled the opinions of certain physicians to controlling weight based on their status as a claimant's treating physician, however, the new regulations have done away with this requirement. *See* **20 C.F.R. § 404.1520c** ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) … including those from your medical sources"). Instead, an ALJ must consider all medical opinions based on factors set out by the Social Security Administration with *supportability* and *consistency* being the most important factors for the ALJ to discuss. **Kaehr v. Saul**, 2021 U.S. Dist. LEXIS 18500, 2021 WL 321450, at *3 (N.D. Ind. Feb. 1, 2021) (emphasis added). An ALJ can, but is not required to, explain how she evaluated the remaining factors which include the relationship with the claimant and any specializations. **20 C.F.R. §404.1520c**.

    Dr. Mumtaz and Ms. Roberts provided a joint medical opinion in July 2019. (Tr. 882-87). In the opinion, they noted that Kylie P. had been receiving services at Park Center since

14

2009.  (T4. 882).  They listed her diagnoses as bipolar disorder with anxious distress, generalized anxiety disorder, posttraumatic stress disorder (PTSD), and cannabis use disorder.  (Tr. 882).  They opined that she would be extremely limited in her ability to be around people due to her extensive trauma history, which resulted in PTSD, anxiety, paranoia, and continued nightmares.  (Tr. 882).  Dr. Mumtaz and Ms. Roberts stated that her mood fluctuations caused Kylie P. to lose sleep and isolate, and when she was stressed, she experienced anxiety to the point of vomiting and hallucinations.  (Tr. 882).  They opined that her prognosis was poor.  (Tr. 882).  Dr. Mumtaz and Ms. Roberts noted that Kylie P. had difficulty with basic life skills, particularly with keeping appointments, taking medications, and structuring her day.  (Tr. 882).  They stated that she experienced impaired judgment, resulting in denial of her illness, which resulted in erratic adherence to medications and treatment.  (Tr. 882).  They opined that in all areas but one, Kylie P. would be able to perform the mental abilities and aptitudes for work less than 70% of a normal workday and workweek.  (Tr. 884-885).  They stated that she could adhere to basic standards of neatness and cleanliness 90-99% of a normal workday and workweek.  (Tr. 885).  Dr. Mumtaz and Ms. Roberts opined that Kylie P. had marked limitations in concentrating, persisting, and maintaining pace and in her ability to understand, remember, and apply information.  (Tr. 886).  They also stated she had extreme limitations in her ability to interact with others.  (Tr. 886).  Finally, they opined that Kylie P. would miss more than four days per month as a result of her mental impairments.  (Tr. 886).

  The ALJ found that this opinion was not persuasive.  (Tr. 48).  The ALJ noted that mental health treatment notes found Kylie P. to exhibit normal behavior, appearance, and thought form.  (Tr. 48).  She was cooperative, pleasant, attentive, congruent, awake, oriented, and her mood was variable from euthymic to irritable.  (Tr. 48).  Moreover, the ALJ noted that treatment improved

her functioning. (Tr. 48). The ALJ found that the record showed an improvement with treatment and a lack of inpatient care even without consistent treatment. (Tr. 48).

The ALJ once again relied on normal behavior, appearance, thought form, and congruent affect and mood that varied from euthymic to irritable. As discussed above, this was a mischaracterization of the evidence, which frequently showed abnormal thought content, mood, and affect. The ALJ also failed to discuss the consistency of this medical opinion with the testimony of Ms. Browning, Kylie P.'s case manager. Dr. Mumtaz and Ms. Roberts found that Kylie P. had an extreme limitation in interacting with others, which was consistent with Ms. Browning's testimony regarding Kylie P.'s interaction with housemates and staff. (Tr. 48, 70-73). Dr. Mumtaz and Ms. Roberts also opined that Kylie P. was stressed by working within a schedule, completing tasks, working with other people, dealing with the public, dealing with supervisors, being criticized by supervisors, and getting to work regularly. (Tr. 48). Again, this was consistent with Ms. Browning's testimony that Kylie P. struggled to get out of bed independently, interact appropriately with housemates and staff, receive redirection, and complete tasks without breaks. (Tr. 68-73). The ALJ did not discuss Ms. Browning's testimony outside of her description of "disability" as defined by Cedars Hope, despite the fact that Ms. Browning's testimony supported the opinion of Dr. Mumtaz and Ms. Roberts.

Finally, the ALJ relied on Kylie P.'s symptoms improving with treatment and a lack of inpatient care in dismissing the medical opinion of Dr. Mumtaz and Ms. Roberts. The ALJ first noted that despite Dr. Mumtaz and Ms. Roberts noting that Kylie P. had medication management, inpatient hospitalization, and case management services, there "[wa]s not evidence during the period at issue to support the conclusion that the claimant was admitted for inpatient hospitalization." (Tr. 48). However, Dr. Mumtaz and Ms. Roberts made no indication that Kylie

P. received all of these treatment options during the period at issue.  Instead, they noted that Kylie P. had received services from Park Center since 2009, during which time she received a variety of treatments, including medication management, therapy, inpatient hospitalization, and case management services.  (Tr. 882).  The opinion does not say or imply that the hospitalization occurred during the relevant period, only that Kylie P. had received inpatient care sometime during treatment with Park Center, which dates back to 2009.  Dr. Mumtaz and Ms. Roberts specifically noted that her treatment varied due to the nature of her illness.  (Tr. 882).

      Moreover, the ALJ erred in relying on a lack of inpatient care in dismissing the opinion of Dr. Mumtaz and Ms. Roberts.  "The institutionalization of the mentally ill is generally reserved for persons who are suicidal, otherwise violent, demented, or (for whatever reason) incapable of taking care of themselves."  *Voigt v. Colvin*, 781 F.3d 871, 876 (7th Cir. 2015) (citing *Browning v. Colvin*, 766 F.3d 702, 705 (7th Cir. 2014); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014); *Pate-Fires v. Astrue*, 564 F.3d 935, 946-47 (8th Cir. 2009)).  Therefore, it is an error to rely on a lack of hospitalization to discredit mental health symptoms or medical opinions.  *See Adkins v. Astrue*, No. 309-CV-217, 2010 WL 3782388, at *9 (N.D. Ind. Sept. 21, 2010) ("Because there is no evidence in the record that severe mental impairments necessarily (or even generally) result in hospitalization, and that conclusion seems untenable, this Court concurs with [the claimant] that his lack of hospitalization was not a proper basis for discrediting his testimony regarding his symptoms.").  On remand, the ALJ should properly discuss the relevant evidence related to Kylie P. mental impairments.

      Kylie P. makes other arguments regarding medical opinion evidence, the Listings analysis at step three, and the subjective symptom analysis.  However, because the ALJ erred in mischaracterizing medical evidence and improperly analyzing medical opinion evidence, the court

17

need not address the additional argument at this time. Proper analysis of the medical evidence may impact the rest of the decision. The ALJ will have the opportunity to revisit these other issues on remand.

Based on the foregoing reasons, the decision of the Commissioner is **REMANDED**.

ENTERED this 7th day of April, 2022.

/s/ Andrew P. Rodovich<br>United States Magistrate Judge